**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| ALBERT ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20cv596 |
| | ) | |
| WINSTON-SALEM POLICE | ) | |
| DEPARTMENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the Court on the "Motion for Existence of Insanity Determination" (Docket Entry 40) ("Plaintiff's First Motion") filed by Albert Anderson (the "Plaintiff"); Plaintiff's letter request dated August 5, 2022 (Docket Entry 58) ("Plaintiff's Second Motion"); "Defendants Ferguson, LaValley, and Boissey's Motion to Seal Exhibit A to the Affidavit of B.A.M. Ferguson" (Docket Entry 44) ("Defendants' Sealing Motion"); Plaintiff's "Motion to Unseal Exhibit A to the Affidavit of B.A.M. Ferguson to the Public" (Docket Entry 51) ("Plaintiff's Unsealing Motion"); and the "Motion for Summary Judgment of the Remaining Defendants, Defendants Ferguson, LaValley, and Boissey" (Docket Entry 42) ("Defendants' Summary Judgment Motion"). For the reasons that follow, the Court (i) will deny Plaintiff's First Motion; (ii) will grant in part and deny in part Plaintiff's Second Motion; (iii) will deny Defendants' Sealing Motion; (iv) will grant Plaintiff's Unsealing Motion (collectively with Defendants' Sealing

Motion, the "Sealing-Related Motions") as specified herein; and (v) should grant Defendants' Summary Judgment Motion.

## <u>BACKGROUND</u>

Alleging violations of his constitutional rights arising from his arrest on January 2, 2020, Plaintiff sued, among others, Officers Ferguson, LaValley, and Boissey (collectively, at times, the "Defendants"). (<u>See</u> Docket Entry 2 (the "Complaint"); <u>see also</u> Docket Entry 5 (the "Amended Complaint").) As relevant here, Plaintiff asserts:

On January 2, 2020, Plaintiff temporarily stopped his scooter at "the side of the road to fix [his] mirror." (Docket Entry 2 at 8.)[1] "[A]n unmarked car pulled" up behind Plaintiff and, "not knowing who the individual was who was in the car, [Plaintiff] ran for [his] life." (<u>Id.</u>) As Plaintiff "was knocked of[f his] scooter by the car[, he] ran on foot and was chased by [Officer Ferguson,] who tackled [Plaintiff] and beg[a]n to pull [Plaintiff's] hair out as [Officer Ferguson] stuck his fingernails behind [Plaintiff's] ears as [Plaintiff] got handcuffed." (<u>Id.</u>) While Officer Ferguson held Plaintiff "in a 'chokehold' until [Plaintiff] fainted" (<u>id.</u>), Officers Boissey and LaValley began striking Plaintiff before Officer LaValley pulled down Plaintiff's pants and Officers Boissey and LaValley stuck their fingers into

_____

    1  Docket Entry page citations utilize the CM/ECF footer's pagination.

Plaintiff's anal area (see id. at 8-9). "When [Plaintiff] woke up [he] got up off the ground [and] skin was missing from [his] face." (Id. at 8.) Officer Ferguson "continued to use abusively brutal force all the way to the county jail." (Id.)

Reviewing Plaintiff's Complaint and Amended Complaint pursuant to 28 U.S.C. § 1915A (see Docket Entry 6 (the "Recommendation") at 1), the undersigned United States Magistrate Judge determined that "Plaintiff state[d] a claim against [Officers Ferguson, LaValley, and Boissey] for the use of excessive force during Plaintiff's arrest and that the Complaint should go forward as to those Defendants in their individual capacities" (id. at 3). Accordingly, the Recommendation proposed that "Plaintiff's individual capacity claims against Defendants . . . be allowed to proceed but that the remainder of [his] claims be dismissed." (Id. at 5.) The Court (per United States District Judge Loretta C. Biggs) adopted the Recommendation, authorizing Plaintiff to proceed solely on his individual-capacity excessive force claims against Defendants. (Docket Entry 9 at 1.)

Shortly thereafter, Plaintiff attempted to add additional defendants, as well as additional claims regarding an incident in September 2019, to this lawsuit. (See Docket Entry 10 at 1.) Plaintiff subsequently withdrew that amendment request. (See Docket Entry 18 at 1.) A few weeks later, however, Plaintiff again sought to add additional defendants and claims to this action.

3

(See Docket Entry 20 at 1-6.)  The Court (per the undersigned) denied this request, explaining, in part, that

> although [(Docket Entry 20)] contains allegations that the remaining two proposed new individual [d]efendants, R.T. Phillips and S.D. Wagoner, performed acts of excessive force against Plaintiff, Plaintiff previously filed [(Docket Entry 10)], proposing to add those two officers as [d]efendants because he had obtained police reports identifying them as participants in the use of excessive force against him, but then filed [(Docket Entry 18)] withdrawing that request and stating:  "I don't want to add anymore.  My understanding is not the best and as you know I am a mental patient. . . ."  Plaintiff then expressed in [(Docket Entry 18)] (as he had earlier in [(Docket Entry 11)]) a desire for his case to move forward as quickly as possible.  Nothing in [(Docket Entry 20)] explains Plaintiff's reversal of his reversal regarding the addition of Phillips and Wagoner as [d]efendants. Without any such explanation, the Court cannot find that "justice [] requires," Fed. R. Civ. P. 15(a)(2), the addition of Phillips and Wagoner as [d]efendants, particularly given that (A) Plaintiff previously has indicated that his desire to add them as [d]efendants resulted from his poor "understanding" and status as a "mental patient," and (B) their addition as [d]efendants would delay the case from moving forward until service of process on them could occur (counter to Plaintiff's twice expressed wishes).

(Text Order dated Jan. 21, 2021 (ellipsis and certain brackets in original).)

Subsequently, the Court (per the undersigned) entered a Scheduling Order in this matter, establishing June 8, 2021, as the deadline for the parties to "file any motions seeking leave to amend pleadings or to add parties."  (Text Order dated Apr. 3, 2021.)  The Scheduling Order also set December 8, 2021, as the deadline for completing discovery.  (See id.)  The parties did not move to amend the pleadings prior to the Scheduling Order deadline.

4

(See Docket Entries dated Apr. 3, 2021, to June 30, 2021.) On December 8, 2021, however, the Court received from Plaintiff (i) a new application to proceed in forma pauperis (see Docket Entry 38 at 1), (ii) another complaint (Docket Entry 39 at 1), and (iii) Plaintiff's First Motion (see Docket Entry 40 at 1).

The day after the Court received these materials, Defendants provided notice of their intent "to file a dispositive motion in this matter." (Docket Entry 37 at 1.) Defendants thereafter moved for summary judgment on Plaintiff's claims as expressed in the Complaint and Amended Complaint, noting that "Plaintiff's purported December 8, 2021 'amended' complaint is a nullity and has no legal effect." (Docket Entry 43 at 2; see generally Docket Entries 42, 43.) In connection with Defendants' Summary Judgment Motion, Defendants filed Defendants' Sealing Motion, seeking leave to file under seal footage from Officer Ferguson's body camera regarding the incident on January 2, 2020. (See Docket Entry 44 at 1-2.) Plaintiff filed a response in opposition to Defendants' Summary Judgment Motion (see Docket Entry 47), to which Defendants replied (see Docket Entry 52-1; see also Text Order dated Aug. 22, 2022 (accepting Docket Entry 52-1 as "Defendants' operative reply")). Plaintiff also filed Plaintiff's Unsealing Motion, opposing sealing of the body camera footage (see Docket Entry 51), which Defendants later contested "for the reasons stated in [Defendants' Sealing Motion]" (Docket Entry 53 at 1). Plaintiff further submitted

5

Plaintiff's Second Motion, potentially seeking to amend his complaint and additionally requesting copies of certain of this Court's Local Rules and the Federal Rules of Civil Procedure (at times, the "Rules"). (See Docket Entry 58 at 1-3.)

As relevant to Defendants' Summary Judgment Motion, the record reflects:

Plaintiff reports, under penalty of perjury, that he "ha[s] been beat[e]n and molested . . . by the Winston Salem police department." (Docket Entry 19 at 1.) He "[is] currently dealing with more ache[s] and pains than [he] ha[s] ever dealt with" and he "was humiliated [and] was treated like a wild animal out the [sic] amazon." (Id.) His "body was exposed in public and [his] hair was ripped from [his] scalp and they stuck their fingers in [his] anal area." (Id. (emphasis in original); see also Docket Entry 58 at 1-2 ("On January 2nd 2019 [sic][, Plaintiff] was molested with penetration up the[] anus under penalty of perjury [video in support]." (all-cap font omitted) (final set of brackets in original)).) He "was struck with a vehicle and brutal[l]y beat[e]n." (Docket Entry 19 at 1-2.)

Conversely, Officer Ferguson avers:

On January 2, 2020, Officer Ferguson served as an officer with the Winston-Salem Police Department, "assigned to the Field Services Bureau Street Crimes unit 'D-3' (SCU-D3)." (Docket Entry 43-2, ¶ 1.) Wearing his "dark blue Tru-Spec BDU style uniform,"

6

which "clearly identified [him] as a Winston-Salem Police Officer," Officer Ferguson "operat[ed] an unmarked vehicle equipped with blue lights" with Officer Wagoner "in the front passenger seat." (<u>Id.</u>) Officer Ferguson wore his body camera, which he "activated during the encounter with Plaintiff." (<u>Id.</u>, ¶ 2.)

On January 2, 2020, "a confidential and reliable informant" contacted Officer Ferguson about "a black male with dreadlocks driving a red moped [who had] arrived at the apartment complex at 321 Gregory Street in Winston-Salem." (<u>Id.</u>, ¶ 3.) Officer Ferguson knows "this apartment complex due to having numerous crimestoppers tips and [he] ha[s] made and assisted with several narcotic related investigations at this apartment complex where various narcotics and firearms were seized." (<u>Id.</u>, ¶ 4.) "The confidential and reliable informant advised that the male got off the scooter and pulled a black handgun out of his pocket and pointed it at a dog. The confidential and reliable informant also advised that the male possibly had narcotics on his person." (<u>Id.</u>, ¶ 3.) Officer Ferguson drove to the area and parked his vehicle where he could observe "the scooter leave the apartment complex." (<u>Id.</u>, ¶ 4.) After he "received information from the confidential informant that the black male driving the red scooter was leaving the apartment complex," Officer Ferguson "observed a black male with dreadlocks leave the apartment complex operating a red scooter, and the black male began driving the red scooter down

7

Gregory Street." (Id.) Officer Ferguson "followed the scooter." (Id., ¶ 5.)

"The driver did not have a helmet on which was a traffic violation, and there was no tag displayed on the scooter, which was also a traffic violation." (Id., ¶ 4.) "The driver of the scooter pulled over to the side of the road and sat briefly." (Id., ¶ 5.)[2] Officer Ferguson "decided to initiate a traffic stop on the scooter based on the traffic violations [he] observed. [Officer Ferguson] activated [his] emergency equipment alerting the driver of the scooter of the traffic stop." (Id.) "Once the driver of the red scooter noticed [Officer Ferguson's] police vehicle behind him it appeared he was going to attempt to flee." (Id., ¶ 6.) Officer Ferguson "decided to conduct a front angle block to keep the driver of the scooter from fleeing on the scooter." (Id.)[3] "After the front angle block was conducted, the driver of the scooter continued to move forward, and the scooter made contact with [Officer Ferguson's] unmarked vehicle. The driver of the scooter then jumped off the scooter and ran back down Gregory Street. The driver of the scooter is [Plaintiff]." (Id.)

"As can been seen in [his] body camera video footage, starting approximately 40 seconds into the footage, [Officer Ferguson]

_____

2  "This can be seen about 31 seconds into [Officer Ferguson's] body camera video." (Id.)

3  "This can be seen approximately 35 seconds into [his] body camera video." (Id.)

quickly got out of [his] unmarked vehicle and chased the driver on foot." (Id., ¶ 7.) Officer Ferguson "contacted communications via radio and alerted additional officers of the foot pursuit. Additional members of the District Three Street Crime Unit were in the area, and they came to the scene." (Id.)

"[Officer Ferguson] chased [Plaintiff] on foot on the west side of Gregory Street in the grassy area. [Plaintiff] ran down the sidewalk and grass and then veered right and crossed behind a white SUV." (Id., ¶ 8.) "As [Plaintiff] was running, he appeared to [Officer Ferguson] to be reaching in his pockets as if he was attempting to grab something. [Plaintiff] then ran in the middle of Gregory Street reaching in his pockets and waist band." (Id.) Officer Ferguson "feared that [Plaintiff] might be reaching for the gun that he was reportedly seen with, and [Officer Ferguson] continued to chase him to close the distance to prevent him from possibly pulling out a gun." (Id.)

"As [Plaintiff] was running, his pants began to fall down." (Id., ¶ 9.)[4] Plaintiff "then fell face first into the middle of Gregory Street, seemingly because his fallen pants caused him to trip. [Plaintiff] then attempted to get up." (Id.) "While [Plaintiff] was attempting to get up, [Officer Ferguson] attempted to jump on top of him in order to gain control of him and to keep

---

4 "This can be observed approximately 48 seconds into [Officer Ferguson's] body camera video footage." (Id.)

9

him from getting up and running away again." (Id.) Due to his momentum, Officer Ferguson ran past Plaintiff and fell "to the ground as well." (Id.) Officer Ferguson "then grabbed at [Plaintiff] in an attempt to take him into custody. While grabbing for [Plaintiff, Officer Ferguson] grabbed part of [Plaintiff's] long dreadlocks but quickly released the hair once [Officer Ferguson] got ahold of [Plaintiff's] body." (Id.)[5] Officer Ferguson "believe[s] that it was when [he] grabbed part of [Plaintiff's] dreadlocks that one or more of the dreadlocks (which [Officer Ferguson] think[s] were woven into [Plaintiff's] natural hair) came loose from the natural hair, and fell to the ground." (Id.)

"As shown by [his] body camera video, [Officer Ferguson] immediately started telling [Plaintiff] to show [Officer Ferguson] his hands, and to 'give me' his hands. At this time, [Plaintiff] was face down on the ground." (Id., ¶ 10.) "Other officers arrived, and attempted to help bring [Plaintiff] under control; however, it seemed to [Officer Ferguson] that officers could not get ahold of [Plaintiff's] arm. [Plaintiff] continued to reach towards his pockets and waist band." (Id.) "After a brief struggle, officers were able to gain control of [Plaintiff's] arms and handcuff [Plaintiff] behind his back." (Id.) Officer

_____

    5 "This can be partially observed approximately 56 seconds into [Officer Ferguson's] body camera video footage." (Id.)

Ferguson's "body camera video footage shows that [Plaintiff's] pants were down at this point; however, [Plaintiff's] pants were down because they had fallen down while he was attempting to run away. [Plaintiff] was arrested for fleeing the traffic stop." (Id.) Plaintiff "continued to pull away from officers while lying on the ground and[,] at this point, he had not yet been searched. [Officer Ferguson] utilized the mandibular angle pressure point technique on the left side of [Plaintiff's] face to attempt to stop [him] from resisting." (Id.) "The mandibular angle pressure point technique is a recognized and accepted law enforcement technique for an officer to apply pressure with a thumb or knuckle for a short period of time to the mandibular nerve (which is behind the ear on the back of the jaw) in order to convince a suspect to stop resisting." (Id.)[6] "The mandibular angle pressure point technique was affective [sic] and [Plaintiff] then complied with commands to stop resisting. [Officer Ferguson] noticed a large baggie had fallen out of [Plaintiff's] pants during the struggle with officers." (Id.) Next:

> Other officers and [Officer Ferguson] then conducted a search of [Plaintiff's] pockets. During the search, [Officer Ferguson] located a baggie that contained a green vegetable matter. This matter was consistent in every way with what [Officer Ferguson] know[s] from [his] training and experience to be marijuana. In the same pocket, [Officer Ferguson] located a digital scale and a pill bottle with no label that contained two pills.

---

6 "This can be seen approximately 1 minute and 51 seconds into [Officer Ferguson's] body camera video footage." (Id.)

These pills were later identified as Oxycodone. This is
a schedule two controlled substance. A large baggie was
also seized that had fallen from [Plaintiff's] pants.
[Officer Ferguson] took a look at the contents of the
baggie. Inside the baggie was several individual baggies
of a white substance. This substance was consistent in
every way with what [Officer Ferguson] know[s] from [his]
training and experience to be cocaine. This substance
was later subjected to a field test where it ha[d] a
positive reaction for the presence of cocaine. Also
inside the baggie was several individual bags of
marijuana. There was also a bindle of a brown substance.
This brown substance was consistent in every way with
what [Officer Ferguson] know[s] from [his] training and
experience to be heroin. This substance was later field
tested where it had a positive reaction for the presence
of heroin. Also located was a large bag of psilocybin
mushrooms. An amount of United States currency was
located in [Plaintiff's] sock. All these items were
seized as evidence. After [Plaintiff's] clothes,
pockets, etc. ha[d] been partially searched, officers
began pulling [Plaintiff's] pants up, and picking
[Plaintiff] off the ground and getting him into an
upright position.

(Id., ¶ 11.)[7]

"Because [he] had seen [Plaintiff] reaching in his waistband

as he ran away from [the officers], after [Plaintiff] was standing

upright and under control, [Officer Ferguson] retraced the path

that [Plaintiff] had taken while he was running from [Officer

Ferguson]." (Id., ¶ 12.) Officer Ferguson "walked toward the

white SUV (where [he] had seen [Plaintiff] reaching) and noticed a

black firearm in the grass directly behind the SUV." (Id.)[8] "The

_____

7 "This process begins approximately 3 minutes and 58 seconds
into [Officer Ferguson's] body camera video footage." (Id.)

8 "This can be seen approximately 5 minutes and 48 seconds
into [Officer Ferguson's] body camera video footage." (Id.)

12

magazine was out of the firearm. It should be noted that it had been raining on this date, as can be clearly seen on [the] body camera video footage." (Id.) "Once [Officer Ferguson] located the firearm, it appeared the firearm was recently placed where it was located due to the firearm not being wet. [Officer Ferguson] seized the firearm as evidence. All the evidence was secured in [his] unmarked patrol vehicle." (Id.)

"Officer S. Boissey investigated the traffic accident portion of this investigation. [Officer Ferguson] walked up to [Plaintiff] and asked if he was hurt. [Plaintiff] indicated that he was hurt, that his face hurt, and that his head hurt, 'that's all.' [Officer Ferguson] told [Plaintiff] that EMS would be called." (Id., ¶ 13.)[9] Officer Ferguson "contacted EMS to come to the Forsyth County Detention Center to examine [Plaintiff]. [Plaintiff] was transported to the Forsyth County Detention Center by other officers." (Id.)

In examining the scooter, Officer Ferguson "noticed the ignition was damaged and wires were exposed as it if [sic] had been hotwired. There was also no key for the moped but it was running without one. [Officer Ferguson] conducted a query on the VIN displayed on the moped and it came back as stolen (IR 1968121)." (Id., ¶ 14.) "Assisting officers contacted the owner of the moped

---

9   "This can be observed beginning around 9 minutes and 30 seconds into [Officer Ferguson's] body camera footage." (Id.)

who . . . . came to the scene and took possession of her moped."
(<u>Id.</u>) Officer Ferguson subsequently "presented evidence to
Magistrate Cheek, who found probable cause to charge and arrest
[Plaintiff] for [various drug and firearm charges], possession of
stolen motor vehicle, [and] resisting a public officer." (<u>Id.</u>,
¶ 15.) At the jail, under a secured bond and "extremely upset
about his charges," Plaintiff "began yelling and cursing stating
that he was going to assault [Officer Ferguson] and that he was
going to get [Officer Ferguson] when he gets out of jail." (<u>Id.</u>)

Subsequently,

> [a]s described in the [Recommendation], Plaintiff
> alleged in his Complaint and Amended Complaint that
> during the encounter on January 2, 2020 on Gregory Street
> in Winston Salem, "Defendant Ferguson . . . allegedly
> held Plaintiff in a chokehold while Defendants LaValley
> and Boissey pulled down Plaintiff's pants and stuck their
> fingers into his anal area." This did not happen.
> [Officer Ferguson] never held Plaintiff in a chokehold
> during the January 2, 2020 encounter on Gregory Street,
> and neither Officer LaValley nor Officer Boissey — or any
> other officer — pulled down Plaintiff's pants and/or
> stuck their fingers into Plaintiff's anal area during
> that January 2, 2020 encounter. This is evident from a
> viewing of [Officer Ferguson's] body camera footage.
> Plaintiff also alleged that he passed out at the scene.
> This is also false.

(<u>Id.</u>, ¶ 16 (ellipsis in original).)

In turn, Officer Boissey avers:

On January 2, 2020, Officer Boissey served as a Winston-Salem
Police Department officer, assigned to the traffic enforcement
unit. (Docket Entry 43-1, ¶ 1.) That day, Officer Boissey "heard
on [his] police radio that Officer Ferguson was involved in a foot

14

chase with a suspect. [Officer Boissey] proceeded to the area."
(Id., ¶ 2.) "When [Officer Boissey] arrived at the scene, the
suspect, [Plaintiff], was already handcuffed and under control.
The first time [Officer Boissey] saw [Plaintiff] that day,
[Plaintiff] was already handcuffed and off of the ground. When
[Officer Boissey] saw [Plaintiff] that day, he was fully dressed."
(Id., ¶ 3.) "[Officer Boissey's] involvement that day was that
after [Plaintiff] had been brought under control and arrested,
[Officer Boissey] did the traffic accident portion of the
investigation. [Officer Boissey] did not use any force on
[Plaintiff] that day." (Id., ¶ 4.) Nonetheless,

> [a]s described in the [Recommendation], Plaintiff
> alleged in his Complaint and Amended Complaint that
> during the encounter on January 2, 2020 on Gregory Street
> in Winston-Salem, "Defendant Ferguson . . . allegedly
> held Plaintiff in a chokehold while Defendants LaValley
> and Boissey pulled down Plaintiff's pants and stuck their
> fingers into his anal area." This is false. [Officer
> Boissey] did not at any time pull down Plaintiff's pants,
> and [Officer Boissey] did not at any time stick [his]
> fingers into Plaintiff's anal area. [Officer Boissey]
> also did not see anyone else pull down [Plaintiff's]
> pants, and [Officer Boissey] did not see anyone else
> stick his or her fingers into [Plaintiff's] anal area.
> As stated above, by the time [Officer Boissey] first saw
> [Plaintiff] at the scene, [Plaintiff] was off the ground,
> fully dressed, and handcuffed.

(Id., ¶ 5 (ellipsis in original).)

Similarly, Officer LaValley avers:

On January 2, 2020, he served as an officer with the Winston-
Salem Police Department. (Docket Entry 43-3, ¶ 1.) He "heard on
[his] police radio that Officer Ferguson was involved in a foot

15

chase of a suspect. [Officer LaValley] proceeded to the scene."

(<u>Id.</u>, ¶ 2.) "When [Officer LaValley] arrived at the scene, the

suspect, [Plaintiff], was already handcuffed and under control."

(<u>Id.</u>, ¶ 3.) "[Officer LaValley] had no involvement in arresting

[Plaintiff], bringing [Plaintiff] under control, or handcuffing

[Plaintiff]. [Officer LaValley] did not touch [Plaintiff] that

day." (<u>Id.</u>, ¶ 4.) However,

> [a]s described in the [Recommendation], Plaintiff
> alleged in his Complaint and Amended Complaint that
> during the encounter on January 2, 2020 on Gregory Street
> in Winston-Salem, "Defendant Ferguson . . . allegedly
> held Plaintiff in a chokehold while Defendants LaValley
> and Boissey pulled down Plaintiff's pants and stuck their
> fingers into his anal area." This is false. [Officer
> LaValley] did not at any time pull down Plaintiff's
> pants, and [Officer LaValley] did not at any time stick
> [his] fingers into Plaintiff's anal area. [Officer
> LaValley] also did not see anyone else pull down
> [Plaintiff's] pants, and [Officer LaValley] did not see
> anyone else stick his or her fingers into [Plaintiff's]
> anal area. As stated above, by the time [Officer
> LaValley] arrived at the scene and first saw [Plaintiff]
> at the scene, [Plaintiff] was off the ground, fully
> dressed, and handcuffed.

(<u>Id.</u>, ¶ 5 (ellipsis in original).)

For his part, R.T. Phillips (at times, "Sgt. Phillips") avers:

On January 2, 2020, Sgt. Phillips served as a Sergeant in the

Winston-Salem Police Department, "assigned to the District Three

Street Crimes Unit. This particular unit specializes in Quality of

Crimes [sic], including . . . Violations of Controlled Substance

Act (VCSA), Violations of City Ordinances, Alcohol related

Violations, Weapons related Violations and Warrant Services."

16

(Docket Entry 43-4, ¶ 1.) That day, Sgt. Phillips "was wearing [his] department vest that had 'police' written across the front," as well as his "departmental SCU black jacket that displayed the word 'police' and a badge on the front." (Id.)

Around 3:15 p.m. on January 2, 2020, Officer Ferguson radioed Sgt. Phillips "in reference to obtaining information about a subject that was at 321 Gregory Street and who had a firearm. 321 Gregory Street is an apartment complex that is known for its 'open air drug market'." (Id., ¶ 2.) Sgt. Phillips "know[s] this area, as [he] ha[s] assisted in numerous drug arrests and seizures in the area. [He is] familiar with the numerous call histories at several apartment buildings on Gregory Street, conversations [sic] with patrol officers and District 3 Street Crimes Officers who patrol/work this particular area." (Id.) "District 3 Street Crimes have conducted numerous drug investigations at this location . . . that have resulted in the apprehensions of both drug dealers and users." (Id.)

"Officer Ferguson advised that he had received reliable information that this subject had displayed a firearm by pointing it at a dog and this subject was also operating a red scooter." (Id., ¶ 3.) "This suspect was further described as a black male with dreadlocks. He was wearing a gray sweatshirt and had on black pants." (Id.) "Officer Ferguson advised [Sgt. Phillips] that the

subject was leaving the apartment complex traveling south on Gregory Street towards Wachovia Street." (Id., ¶ 4.)

Sgt. Phillips "was positioned at the intersection awaiting the scooter to approach the stop sign at Bank Street. [Sgt. Phillips] then heard Officer Ferguson advise that the scooter was stopped on the west side of Gregory Street." (Id.) Sgt. Phillips "came around the corner and [he] could see the scooter and Officer Ferguson's white unmarked patrol car in front of the scooter blocking it on an angle. [Sgt. Phillips] saw the subject who was later identified as [Plaintiff] on the scooter. He fit the earlier description provided by Officer Ferguson." (Id.) Sgt. Phillips "then observed [Plaintiff] get off the scooter and start running north on foot. [Sgt. Phillips] then drove in that direction and observed that [Plaintiff] continued running. [Sgt. Phillips] also observed [Plaintiff's] pants were falling down and had fallen to his ankles." (Id.) "[Plaintiff] was also reaching into his right pocket while he ran. He also dropped a cell phone and clear baggie." (Id.)

Plaintiff "then began to struggle to run because his pants were down around or near his ankles. [Plaintiff] then fell forward and rolled. [Sgt. Phillips] decided at that point to exit [his] unmarked police vehicle and aid in helping Officer Ferguson bring [Plaintiff] under control." (Id., ¶ 5.) "While [they] attempted to bring him under control and place him in handcuffs, [Plaintiff]

18

continued to refuse to place his hands out and kept his right hand under. [Sgt. Phillips] was able to assist with arresting [Plaintiff] by grabbing his left arm and eventually handcuffs were placed on him." (Id.) "[Plaintiff] was arrested. [He] was searched and he was in possession of a scale, VCSA and cash (inside socks)." (Id.)

"When [Plaintiff] stood up, [Sgt. Phillips] observed a scrape on the right side of [Plaintiff's] face and he advised his hair was on the ground. [Sgt. Phillips] retrieved two single pieces of hair (dreads) and placed them into [Plaintiff's] pocket." (Id., ¶ 6.) "Officer Ferguson walked back to the area where [Plaintiff] had ran [sic] and a firearm was located." (Id., ¶ 7.) Sgt. Phillips "transported [Plaintiff] to the Forsyth County Detention Center with Officer Wagoner. EMS (Life Star) treated [Plaintiff] at the jail for the scrape on his face and he told EMS personnel that his head hurt where his hair was pulled out." (Id., ¶ 8.) Plaintiff "did not tell EMS personnel that anyone had stuck fingers into [his] anal area. EMS performed examined [sic] and evaluated [Plaintiff], and they determined that no additional treatment was necessary." (Id.) Contrary to the facts recounted by Sgt. Phillips:

> As described in the [Recommendation], Plaintiff alleged in his Complaint and Amended Complaint that during the encounter on January 2, 2020 on Gregory Street in Winston Salem, "Defendant Ferguson . . . allegedly held Plaintiff in a chokehold while Defendants LaValley and Boissey pulled down Plaintiff's pants and stuck their

19

fingers into his anal area." This did not happen. Officer Ferguson did not hold Plaintiff in a chokehold during the January 2, 2020 encounter on Gregory Street, and neither Officer LaValley nor Officer Boissey — or any other officer — pulled down Plaintiff's pants and/or stuck their fingers into Plaintiff's anal area during that encounter. Plaintiff also alleged that he passed out at the scene. This is also false.

(Id., ¶ 9 (ellipsis in original).)

Finally, Officer Wagoner avers:

On January 2, 2020, he served as a Winston-Salem Police Department officer, "assigned to the District Three Street Crimes Unit. [Officer Wagoner] was the passenger in an unmarked police vehicle with one additional member of the Street Crimes Unit, Officer Ferguson." (Docket Entry 43-5, ¶ 1.) Officer Wagoner's "uniform consisted of a blue BDU style shirt, blue BDU pants, and [his] department issued duty gear. [His] shirt displays a badge that reads Winston Salem Police Officer and has patches on both shoulders which read Winston Salem Police." (Id.)

"Officer Ferguson received information that a black male with dreadlocks was at the apartment complex located at 321 Gregory Street. He advised that the subject was on a red scooter and had displayed a handgun while pointing the gun at a dog in the complex." (Id., ¶ 2.) "Officer Ferguson and [Officer Wagoner] drove to the area and began to conduct surveillance from Wachovia Street. A short time later, Officer Ferguson received information that the subject on the scooter was leaving the apartment complex and traveling towards Gregory Street." (Id., ¶ 3.) "From [their]

20

location on Wachovia Street, a few moments later, [Officer Wagoner] observed a black male with dreadlocks operating a red scooter on Gregory Street South towards Bank Street. [Officer Wagoner] observed the subject not to be wearing a helmet while operating the scooter (which is a violation of North Carolina law)." (Id.)

"Officer Ferguson and [Officer Wagoner] began to travel towards Gregory Street and turned left onto Gregory Street. [They] observed the scooter had pulled to the right on the curb and [they] observed there to be no registration plate displayed on the vehicle, which is a traffic violation." (Id., ¶ 4.) "Officer Ferguson activated the blue lights on [their] vehicle and pulled behind the scooter. [Officer Wagoner] observed the driver of the scooter stand up and place his feet on the ground and it appeared as if the driver was attempting to push the scooter in attempt to flee from police." (Id.) "Officer Ferguson maneuvered [their] vehicle in front of the scooter to prevent the scooter from fleeing. [Officer Wagoner] then observed the male subject later identified as [Plaintiff] quickly get off of the scooter and begin to run [n]orth on the side of and on Gregory Street." (Id.) "Officer Ferguson exited the driver's side of [their] vehicle and began to pursue [Plaintiff] on foot." (Id.)

Officer Wagoner "attempted to exit [their] vehicle but the scooter was blocking [his] door from opening. Knowing that [Plaintiff] was possibly in possession of a firearm and was fleeing

the area, [Officer Wagoner] attempted to open [his] door by kicking it and attempted to unblock the door from opening." (Id., ¶ 5.) Officer Wagoner "was unable to get [his] passenger side door open and so [he] crawled over to the driver's side of [the] vehicle and was able to exit the vehicle that way." (Id.) Officer Wagoner "began to run towards [Plaintiff] and Officer Ferguson. From [his] location, [Officer Wagoner] observed [Plaintiff] running on Gregory Street in the road and it appeared as if his pants were falling down as he ran. [Officer Wagoner] then observed [Plaintiff] trip due to his pants and land on the ground." (Id., ¶ 6.) "Officer Ferguson was able to reach [Plaintiff] as Sergeant Phillips was arriving at the location." (Id.)

Officer Wagoner "reached the spot where [Plaintiff] and Officer Ferguson were on the ground. [Officer Wagoner] heard Sergeant Phillips yell to [Plaintiff] for him to provide Sergeant Phillips his hand. [Officer Wagoner] observed [Plaintiff's] right hand underneath his body." (Id., ¶ 7.) "Based on the provided information that [Plaintiff] was seen with a gun and the fact that his right hand was tucked under his body and [Plaintiff] was not providing Sergeant Phillips his left hand, [Officer Wagoner] delivered one closed hand strike to the lower side of [Plaintiff's] back." (Id.) "Sergeant Phillips was then able to gain access to [Plaintiff's] left hand and he was placed in handcuffs. [Plaintiff] was handcuffed behind his back." (Id.)

22

"Officer Ferguson began to conduct a search of [Plaintiff] and located a digital scale in his right coat pocket. [Officer Wagoner] continued to search the right coat pocket and located a plastic baggie which contained a green leafy substance and an unlabeled pill bottle with [sic] contained two white pills." (Id., ¶ 8.) Officer Wagoner "stood by with [Plaintiff] until he was placed inside of Sergeant Phillips'[s] vehicle. Sergeant Phillips located United States Currency in [Plaintiff's] socks." (Id.) Officer Wagoner "continued to stand with [Plaintiff] until Sergeant Phillips and [Officer Wagoner] transported him to the Magistrate's office. EMS came to the jail due to the fact that [Plaintiff] advis[ed] that he had face pain. EMS examined [Plaintiff], and advised that [Plaintiff] did not appear to need immediate medical attention." (Id., ¶ 9.) "At no time did [Officer Wagoner] hear [Plaintiff] state to EMS or anyone else that any officer had stuck fingers into [Plaintiff's] anal area during the January 2, 2020 encounter on Gregory Street." (Id.) Regardless,

> [a]s described in the [Recommendation], Plaintiff alleged in his Complaint and Amended Complaint that during the encounter on January 2, 2020 on Gregory Street in Winston Salem, "Defendant Ferguson . . . allegedly held Plaintiff in a chokehold while Defendants LaValley and Boissey pulled down Plaintiff's pants and stuck their fingers into his anal area." This did not happen. Officer Ferguson did not hold [Plaintiff] in a chokehold during the January 2, 2020 encounter on Gregory Street, and neither Officer LaValley nor Officer Boissey — or any other officer — pulled down Plaintiff's pants and/or stuck their fingers into Plaintiff's anal area during

23

that encounter. Plaintiff also alleged that he passed
out at the scene. This is also false.

(Id., ¶ 10.)

Defendants also provided video footage from Officer Ferguson's
body camera. (See, e.g., Docket Entry 43-2, ¶ 2.)[10] The video
camera appears affixed somewhere over Officer Ferguson's right ear,
occasionally showing glimpses of his nose or the right side of his
face. As relevant here, the video footage depicts the following:

When the video commences, Officer Ferguson and Officer Wagoner
sit in a stationary car, in the rain, on a residential street,
facing an intersection in the distance. After a figure in dark
clothing drives a scooter across the intersection, Officer Ferguson
starts the car and drives down the street, turning at the
intersection to follow the path of the scooter. As they turn onto
and start up the street, the video shows a white SUV parked on the
sidewalk and grass on the right side of the street, a pedestrian
walking towards the patrol car in the center left portion of the
street, and the scooter stopped to the right side of the street,
multiple car lengths up from the white SUV. When the patrol car
approaches the scooter, Plaintiff, wearing black pants and a grey
coat, has his right foot on the sidewalk and his left foot on the

---

10 Per a police report that Plaintiff submitted in opposition
to Defendants' Summary Judgment Motion, Officer Wagoner
unsuccessfully attempted to initiate his body camera as their
vehicle drew alongside Plaintiff's scooter. (See Docket Entry 47
at 10-11.)

24

scooter.  After the patrol car stops behind the scooter, Plaintiff
looks behind him, then puts his left leg down on the street and
starts to angle the scooter away from the sidewalk into the street.
Officer Ferguson steers the patrol car to the left of the scooter,
while Officer Wagoner starts opening the passenger door and yells,
"Don't run."

As the patrol car draws parallel with the scooter, the video's
audio captures the sound of the scooter starting up.  The patrol
car and the scooter travel parallel to each other for a few seconds
before Plaintiff gets off the scooter, jumping over the front of
the scooter onto the sidewalk as he turns to face the opposite
direction.  Officer Ferguson places the car in park and exits the
vehicle.  Three seconds elapse between Plaintiff placing his left
leg on the street after the officers approached and Plaintiff
jumping over the front of the scooter.  Two more seconds pass as
Officer Ferguson puts the car in park and starts to exit the
vehicle.  By the time Officer Ferguson passes the rear of his
vehicle two seconds later, Plaintiff has run down the sidewalk,
dropping a white piece of fabric that he held in his hand while on
the scooter.

Officer Ferguson calls in the foot pursuit, finishing as
Plaintiff cuts out of the camera view as he runs behind the white
SUV.  As Officer Ferguson nears the back of the SUV, yelling, "Let
me see your hands, Dude," the video again captures Plaintiff.  His

25

black pants start falling down as he runs away from the SUV towards
the original intersection, reaching below his knees as he starts to
cross the intersection. Officer Ferguson yells, "Stop reaching,"
as Plaintiff continues running away, with his green undershorts
also starting to fall down. Upon arriving at the other end of the
intersection, with his black pants near his ankles, Plaintiff
falls, rolling over a few times before coming up on his knees
facing Officer Ferguson. As Plaintiff begins to fall and roll,
Sgt. Phillips pulls up in an orange car. When Plaintiff rises to
his knees, facing Officer Ferguson, Plaintiff reaches with both
hands towards or into his left front jacket pocket. The video
appears to show Officer Ferguson run into Plaintiff, with both of
them ending up flat on the street a second later, Plaintiff face-
down with Officer Ferguson lying beyond Plaintiff's head and
gripping Plaintiff's hair. Officer Ferguson quickly gets up and
grabs Plaintiff's arm and collar bone area, letting go of his hair,
while yelling, "Let me see your hands." Two second elapse between
when they hit the ground and when Officer Ferguson grabs
Plaintiff's arm and collar bone area. Officers keep yelling to
Plaintiff to "give" them his hands as Officer Ferguson gets a grip
on Plaintiff's right hand and brings it behind his back, where
Officer Wagoner and Sgt. Phillips assist Officer Ferguson in
handcuffing Plaintiff.

The video shows that Plaintiff's pants, shorts, and underwear have fallen down his legs, baring his rear end, as the officers work to handcuff him. During the handcuffing process, Officers Ferguson and Wagoner look at a baggie and an apparent pack of cigarettes in the street behind Plaintiff. While attempting to put the handcuffs on Plaintiff, Officer Ferguson yells, "Stop Dude," and "Stop moving." One of the other officers tells Officer Ferguson to "hold onto him for a second," and Officer Ferguson responds, "I got him." The video depicts Officer Ferguson holding the handcuffs with his right hand before he reaches up with his left hand and covers the camera, adjusting its position,[11] as he looks to his left and says, "Go the other way," and "Go around," as one of the other officers says, "Just walk quick." Because his hand does not fully obscure the video camera for the entire interval, one can see portions of Officer Ferguson's face and Sgt. Phillips's car behind him, indicating that Officer Ferguson remained upright during this interval.

When Officer Ferguson removes his hand and looks back towards Plaintiff, still lying on the street, the video camera shows Officer Wagoner continuing to kneel on/beside Plaintiff and Sgt.

_____

11  When Officer Ferguson fell, the camera vantage point switched from parallel with the ground to pointing downward. When Officer Ferguson finished adjusting the camera, it had returned to closer to its original orientation.

27

Phillips standing up from his position near Plaintiff's head.[12]  As Sgt. Phillips walks back towards his car, Officer Ferguson exclaims, "Stop moving."  Plaintiff appears to continue rocking back and forth before Officer Ferguson yells, "Didn't I say to stop fucking moving?" and reaches up behind Plaintiff's left ear. Officer Ferguson presses behind Plaintiff's ear with his thumb for nine seconds, saying again, "Stop moving," and then, "It's Albert Anderson, that's who it is."  Officer Wagoner then repeats, "Albert Anderson."  Plaintiff blinks throughout the period where Officer Ferguson applies pressure behind his ear.

Officer Ferguson next looks to his left, so the video camera captures Sgt. Phillips[13] searching Plaintiff's black pants as Officer Wagoner continues to kneel against Plaintiff's left buttock.  Officer Ferguson radios in an update and then looks to his right, in the direction from which Plaintiff had originally driven the scooter, revealing the pedestrian continuing to walk down the street.  Sgt. Phillips and Officer Ferguson start searching Plaintiff's jacket before Officer Ferguson tells someone over the radio to secure the scooter.  Plaintiff says, "Pull my pants up, please," to which Officer Ferguson replies, "I ain't doing anything right now," as he adjusts Plaintiff's position to

---

12  For reasons not revealed in the video, Sgt. Phillips does not wear a shoe on his right foot at this point in time.

13  Sgt. Phillips wears a shoe on his right foot at this point.

28

facilitate the search of his jacket.  This change in position puts in Plaintiff's view one of his dreadlocks, lying in the street near his head.  Plaintiff then says, "Oh you pulled my hair out.  Shit." He then complains about the tightness of his handcuffs, to which Officer Ferguson responds, "Well, you shouldn't have been fighting!" and "I ain't doing anything right now," as he continues to search Plaintiff's jacket.

Officer Ferguson locates a digital scale in Plaintiff's right jacket pocket.  Officer Wagoner then removes the digital scale, a baggie with a green substance, and a pill bottle containing two white pills from that pocket as Plaintiff and Officer Ferguson continue to discuss the tightness of Plaintiff's handcuffs. Plaintiff repeatedly calls Officer Ferguson by name — specifically, "Ferguson" — during this exchange.  Officer Ferguson adjusts Plaintiff's position during the search, bringing into Plaintiff's vision another dreadlock lying on the street.  At that point, Plaintiff states:  "Oh, you ripped my damn — you ripped all my hair out, Ferguson."  Sgt. Phillips then tells Plaintiff to "roll over, I'm going to pull your pants up," before he pulls Plaintiff's black-and-white stripped underwear up.  Plaintiff again says, looking up at Officer Ferguson, "Oh you ripped all my hair out man," to which Officer Ferguson responds, "I tackled you."  Sgt. Phillips pulls Plaintiff's black undershorts and green undershorts up a little before saying, "Let's get him up."  Officer Ferguson

29

and Sgt. Phillips lift Plaintiff to his feet, after which Sgt. Phillips says, "Don't move, you understand?" Officer Ferguson pulls up Plaintiff's green undershorts before Officer Wagoner and Sgt. Phillips pull up his black pants. Officer Ferguson holds Plaintiff's hand as the other officers fix Plaintiff's pants.

Officer Wagoner removes one pair of handcuffs from Plaintiff's wrist as a white car pulls up, parking beside Sgt. Phillips's car in front of Plaintiff.[14] An officer subsequently approaches, but does not interact with, Plaintiff, Sgt. Phillips, Officer Ferguson, and Officer Wagoner.[15] Sgt. Phillips continues searching the front of Plaintiff's jacket while Officer Ferguson says, "I'm going to walk where he ran. You wanna hold him, you good?" to Officer Wagoner. Before walking away, Officer Ferguson searches two of Plaintiff's right jacket pockets and pulls up the right side of Plaintiff's pants a little farther, totally covering Plaintiff's green undershorts. Officer Ferguson then says, "Alright, I'm going to walk," and starts walking back up the road, retracing the path that he and Plaintiff ran.

_____

14  Simultaneously, a white SUV drives by in the other direction, evidently carrying civilians. Additionally, a white police car turns at the intersection visible behind Sgt. Phillips's car and travels in the direction of the scooter and Officer Ferguson's patrol car.

15  Unlike with Officer Wagoner and Officer Boissey, this officer's name tag remains unreadable throughout the video.

Along that path, Officer Ferguson discovers a handgun at the rear of the white SUV, lying near a magazine. Another police officer, wearing a hoodie, approaches from the front of the SUV as Officer Ferguson empties a bullet from the handgun before taking the firearm, magazine, and bullet with him back to his patrol car. Officer Ferguson then walks back to his patrol car, where he puts the firearm materials in a manilla envelope in his trunk. His patrol car displays flashing blue and white lights as he approaches. The patrol car remains parked at an angle, with its front right bumper pointed towards the sidewalk and the scooter between its partially opened front passenger door and the sidewalk. As Officer Ferguson reaches his patrol vehicle, another police officer walks down the sidewalk towards him, coming from farther up the street beyond Officer Ferguson's car, while another white police car, driven by Officer Boissey, parks on the opposite side of the street from Officer Ferguson's car. While Officer Ferguson rummages around in his trunk, Officer Boissey walks into camera view behind Officer Ferguson. After he secures the firearm materials in his trunk, Officer Ferguson walks up beside his car saying, "Let me see if this is going to be a 1050 cause he, we tried to block [h]im off and he rammed it into us."

Although somewhat unclear on the video, it appears that some white paint may have transferred from the car door to the side of the scooter, but Officer Ferguson and the officer on the sidewalk

31

both indicate that they do not see any damage. As Officer Ferguson walks towards the front of the patrol car and scooter, the video shows flashing red and blue lights on the front side of the car's passenger mirror as well as flashing blue lights from the rear passenger window and the middle of the front windshield. The car's (angled) tire touches the curb in front of the scooter, the front tire of which appears wedged between the rear portion of the car's front tire and the sidewalk. Noting the scooter's lack of a tag, Officer Ferguson expresses his view that the scooter "[i]s probably going to be stolen" before he walks back down the sidewalk, retracing his and Plaintiff's path.[16]

During Officer Ferguson's approach, Officer Wagoner holds Plaintiff's handcuffs as they stand outside Sgt. Phillips's car and Sgt. Phillips puts various boxes into the car. Officer Ferguson asks Plaintiff, "are you hurt," prompting Plaintiff to nod and indicate that his face hurt, his hand or head hurt,[17] and his "head hurt from [his] hair being pulled out, that's all." Officer Ferguson and Sgt. Phillips tell Plaintiff that they will contact

---

16  Officer Ferguson encounters multiple police officers in his return walk, including the officer in the hoodie, Officer Boissey, and the first officer to appear on the scene after Officer Ferguson, Sgt. Phillips, and Officer Wagoner subdued Plaintiff. That officer and yet another officer get into a white car to "get back to work" as Officer Ferguson continues walking down the street towards where Plaintiff, Officer Wagoner, and Sgt. Phillips stand.

17  The audio does not make clear whether Plaintiff states that his "hand" or his "head" hurt.

EMS to examine him at the jail. As Plaintiff gets into the back of Sgt. Phillips's car, his right pant leg rides up, revealing a bulge at the back of his sock. Officer Ferguson alerts the other officers to the bulge and Sgt. Phillips has Plaintiff step back out of the car, at which point Sgt. Phillips recovers a wad of cash from Plaintiff's sock. Officer Ferguson tells Plaintiff to get back in the car, at which point Plaintiff asks, "Can you get my hair off the ground at least," to which Sgt. Phillip responds, "We put it in your pocket" as Officer Ferguson closes Plaintiff's door. Sgt. Phillips gets in the driver's seat as Officer Ferguson turns around, facing away from the car, towards Officer Boissey and the officer in the hoodie. The video then ends.

Finally, as relevant to Plaintiff's Second Motion, the record reflects that, by February 10, 2022, Plaintiff no longer remained in custody. (See Docket Entry 54 at 1 (providing notice of change of address).) However, Plaintiff returned to state custody by July 2022. (See Docket Entry 56 at 1 (providing notice of change of address); Docket Entry 56-1 at 1 (indicating "INMATE MAIL" on envelope (all-cap font in original)).)

**DISCUSSION**

**I. Plaintiff's First Motion**

As a preliminary matter, Plaintiff's First Motion purports to seek relief "pursuant to 18 U.S.C. § 4242." (Docket Entry 40 at 1 (all-cap font omitted).) The cited statutory provision governs

33

situations wherein a criminal defendant "intends to rely on the defense of insanity." 18 U.S.C. § 4242(a). Plaintiff, however, pursues a civil claim against Defendants, rendering inapplicable the cited provision. (See, e.g., Docket Entries 2, 5.)

Per Plaintiff's First Motion, "on the date of January 2nd, 2020[,] the Winston Salem Police Dept. did in fact cause a psychological breakdown up until December 2nd which bring[s] forth this styled mental competency movement [sic]." (Docket Entry 40 at 2 (all-cap font omitted).) The motion further asserts that, due to this incident, Plaintiff "was so in a state of ignorance [that he] lacked the quality and importance of [his] signature on a document that clearly insisted" and his "mental ability was in a defect stage to be ab[le] to handle[ ]business and litigate [his] ordeal, but [he] knew that [he ] had been raped and brutalized. (Id. (all-cap font omitted).) Plaintiff's First Motion continues:

> [Plaintiff's] experience on January 2nd left [him] with a temporary disease[,] a defective condition[,] an insanity[,] a lack of fitness to be held responsible for dea[dl]ine[s. His] feelings and emotion were affected[,] which tampered with [his] ethical social relations.

> [Plaintiff is] requesting a determination based on the fact and weight of [the] surveillance footage to be redeemed in the fight to administer that [sic] law and prove to North Carolina that [he] was in[ ]fact raped and intruded . . . In which [he] ha[s] filed another 1983 form seeking the maximum punishment on monetary damages to exi[st.]

Mental Health History Documented
See Report

34

(Id. at 3 (all-cap font omitted) (ellipsis, emphasis, and centering in original).)

Given the submission of Plaintiff's First Motion alongside another amended complaint and new in forma pauperis motion (see Docket Entries 38-40), and considering the grounds upon which the Court previously denied Plaintiff's request for leave to amend his pleadings (see Text Order dated Jan. 21, 2021 (observing that, inter alia, "[n]othing in [(Docket Entry 20)] explains Plaintiff's reversal of his reversal regarding the addition of Phillips and Wagoner as [d]efendants" and that "[w]ithout any such explanation, the Court cannot find that "justice [] requires," Fed. R. Civ. P. 15(a)(2), the addition of Phillips and Wagoner as [d]efendants" (penultimate set of brackets in original))), it appears that Plaintiff's First Motion seeks leave to amend his pleadings. Notably, though, Plaintiff failed to file Plaintiff's First Motion until after the deadline for seeking leave to amend the pleadings passed. (Compare Text Order dated Apr. 3, 2021 (establishing deadline of June 8, 2021, for seeking such leave), with Docket Entry 40 at 3 (bearing signature date of December 6, 2021).)

When a party misses the deadline for seeking leave to amend his pleadings, he must satisfy both the mandates of Rule 16(b), which "provides that a schedule shall not be modified except upon a showing of good cause and by leave of the district judge," as well as the strictures of Rule 15(a), which "provides that leave to

amend shall be freely given when justice so requires." Nourison
Rug Corp. v. Parvizian, 535 F.3d 295, 298 (4th Cir. 2008) (internal
quotation marks omitted); see also Cook v. Howard, 484 F. App'x
805, 814-15 (4th Cir. 2012) (explaining that, after scheduling
order deadline, "a party must first demonstrate 'good cause' [under
Rule 16(b)(4)] to modify the scheduling order deadlines, before
also satisfying the Rule 15(a)(2) standard for amendment"). "'Good
cause' requires 'the party seeking relief [to] show that the
deadlines cannot reasonably be met despite the party's diligence,'
and whatever other factors are also considered, 'the good-cause
standard will not be satisfied if the [district] court concludes
that the party seeking relief (or that party's attorney) has not
acted diligently in compliance with the schedule.'" Cook, 484 F.
App'x at 815 (brackets in original).

Accordingly, "in considering whether 'good cause' excuses
compliance with a scheduling order deadline, the district court
*must* examine whether the movant had been diligent, though
unsuccessful, in attempting to acquire the information that would
have formed the basis of a timely motion to amend." Id. at 818-19
(emphasis in original). "If that party was not diligent, the
inquiry should end." Johnson v. Mammoth Recreations, Inc., 975
F.2d 604, 609 (9th Cir. 1992) (explaining that, "[a]lthough the
existence or degree of prejudice to the party opposing the
modification might supply additional reasons to deny a motion, the

36

focus of the inquiry is upon the moving party's reasons for seeking modification"). Moreover, if a party knew or should have known of the basis for the proposed amendment prior to the scheduling order deadline, "then the party cannot establish good cause under Rule 16," Faulconer v. Centra Health, Inc., 808 F. App'x 148, 152 (4th Cir. 2020). See, e.g., Cummins, Inc. v. New York Life Ins., No. 10 Civ. 9252, 2012 WL 3870308, at *3 (S.D.N.Y. Sept. 6, 2012) ("The focus of the good cause inquiry is on the diligence of the party seeking to amend, and the court may deny leave to amend where the party seeking it knew or should have known the facts sought to be added to the complaint."); Interstate Narrow Fabrics, Inc. v. Century USA, Inc., 218 F.R.D. 455, 460 (M.D.N.C. 2003) ("'Good cause' under Rule 16(b) exists when evidence supporting the proposed amendment would not have been discovered 'in the exercise of reasonable diligence' until after the amendment deadline had passed. Good cause is not shown when the amendment could have been timely made." (citation and final set of internal quotation marks omitted)); see also Cook, 484 F. App'x at 817 ("The lack of diligence that precludes a finding of good cause is not limited to a plaintiff who has full knowledge of the information with which it seeks to amend its complaint before the deadline passes. That lack of diligence can include a plaintiff's failure to seek the information it needs to determine whether an amendment is in order." (internal quotation marks omitted)).

37

If a party can establish "good cause" under Rule 16(b)(4), the Court must also consider the Rule 15(a) factors. The United States Court of Appeals for the Fourth Circuit has "interpreted Rule 15(a) to provide that 'leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (en banc).

Here, Plaintiff seeks to amend his pleadings to add many of the same claims that he proposed prior to the scheduling deadline. (Compare Docket Entry 39, with Docket Entry 20.) Moreover, Plaintiff's proposed amended complaint focuses on activities that occurred, in his presence, on or about September 25, 2019, and January 2, 2020. (See generally Docket Entry 39.) To the extent that Plaintiff seeks to excuse his delay in seeking to add these proposed claims to his lawsuit due to mental illness (see Docket Entry 40 at 2-3), he provides no evidence to support his mental health contentions (see Docket Entries 40, 41). Accordingly, Plaintiff has failed to establish the diligence required to pursue his proposed amendment. See, e.g., Faulconer, 808 F. App'x at 152. In addition, even assuming that Plaintiff satisfied the Rule 16(b)(4) requirements, his request fails as too prejudicial under Rule 15(a). Put simply, at the close of discovery, Plaintiff sought to significantly expand the scope of this litigation, which

38

would have required Defendants to essentially restart the discovery process, particularly insofar as Plaintiff seeks to introduce claims against Officer LaValley regarding the alleged incident in September 2019 (see Docket Entry 39 at 16; Docket Entry 47 at 2-3, 15-16.)  For all these reasons, the Court will deny Plaintiff's First Motion.

## II. Plaintiff's Second Motion

Months after Defendants moved for summary judgment, Plaintiff submitted Plaintiff's Second Motion.  (See Docket Entry 58 at 1-2 (reflecting filing in August 2022).)  This document consists of a two-page letter, followed by a Forsyth County Detention Services Bureau Inmate Grievance Form from July 2022.  (See id. at 1-3.) Plaintiff's Second Motion explicitly requests only one form of relief:

> In light of my current incarceration status to accom[o]date myself in litigating this case being that I am a pro-se I[] am requesting a copy of the Civil Rules Portion of the Local Rules, as well as Federal Rules of Civil Procedure 5, 5.2, 6, 7, 10, 11, 15, 16, 26, 28, 29, 30, 31, 33, 34, 36, 45, 56 and 72.

(Id. at 2.)

The Court (per the undersigned) previously directed the Clerk to send Plaintiff a copy of the requested materials.  (See Text Order dated Apr. 3, 2021.)  Nevertheless, given Plaintiff's release and subsequent return to custody (see Docket Entries 54, 56), the Court will grant Plaintiff's request for copies of the specified Rules and Local Rules.

39

In addition to its explicit request for relief, Plaintiff's Second Motion details various allegations regarding the Winston-Salem Police Department and its officers, the Forsyth County Detention Center, and the Forsyth County Detention Center Medical Provider. (See Docket Entry 58 at 1-2.) According to Plaintiff's Second Motion, as a result of an "action of venge[a]nce," Plaintiff "ha[s] become so concern[ed] for [his] well-being [that he] was forced to write [the Court] for help in the form of injunctive relief." (Id. at 1.) Plaintiff's Second Motion also contains a grievance from July 2022, in which Plaintiff asserts that an Officer Correa seized Plaintiff's phone on June 28, 2022, and requests the return of that "phone along with a check/money for [d]amages." (Id. at 3.) To the extent Plaintiff again seeks to add new claims against the Winston-Salem Police Department and its officers, the Forsyth County Detention Center, and the Forsyth County Detention Center Medical Provider relating to the incident on January 2, 2020, that attempt fails for a lack of diligence, for the reasons previously discussed.

To the extent Plaintiff seeks to add a claim against Officer Correa for return of his phone and compensation (see id. at 1, 3), the Court will deny that request as well. "[A] court determining whether to grant a motion to amend to join additional [parties] must consider both the general principles of amendment provided by Rule 15(a) and also the more specific joinder provisions of Rule

40

20(a)." Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 618 (4th Cir. 2001). Rule 20(a) authorizes joinder of multiple defendants in one action only where "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2) (emphasis added). Assuming satisfaction of those requirements, "Rule 20 gives courts wide discretion concerning the permissive joinder of parties." Aleman v. Chugach Support Servs., Inc., 485 F.3d 206, 218 n.5 (4th Cir. 2007). Courts should construe Rule 20 "in light of its purpose, which is to promote trial convenience and expedite the final determination of disputes." Id. (internal quotation marks omitted). As such, "[t]he [C]ourt has discretion to deny joinder if it determines that the addition of the party under Rule 20 will not foster the objectives of the rule, but will result in prejudice, expense, or delay." Id. (internal quotation marks omitted).

Furthermore, where, as here, an incarcerated plaintiff seeks joinder of multiple defendants, additional considerations arise. As the United States Court of Appeals for the Seventh Circuit has explained:

> The controlling principle appears in [Rule] 18(a): "A
> party asserting a claim to relief as an original claim,
> counterclaim, cross-claim, or third-party claim, may
> join, either as independent or as alternate claims, as

41

many claims, legal, equitable, or maritime, as the party
has against an opposing party." Thus multiple claims
against a single party are fine, but Claim A against
Defendant 1 should not be joined with unrelated Claim B
against Defendant 2. Unrelated claims against different
defendants belong in different suits . . . to ensure that
prisoners pay the required filing fees — for the Prison
Litigation Reform Act limits to 3 the number of frivolous
suits or appeals that any prisoner may file without
prepayment of the required fees. 28 U.S.C. § 1915(g).

George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007). Courts must guard against an inmate seeking to join multiple defendants in a single suit "not only to save money but also to dodge that rule." Id.

Here, during the pendency of Defendants' Summary Judgement Motion, Plaintiff has sought to introduce a new claim against a new defendant. (See Docket Entry 58 at 3.) Plaintiff's proposed claim against Officer Correa regarding the seizure of Plaintiff's phone in June 2022, does not "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences," Fed. R. Civ. P. 20(a)(2) (emphasis added), as his excessive force claims against Defendants related to his arrest in January 2020. Accordingly, Rule 20 precludes the addition of such claim. Moreover, even assuming that Plaintiff satisfied the Rule 20 requirements, the Court would exercise its discretion to deny this amendment request. Adding a new claim at this juncture — after the close of discovery and the completion of briefing on Defendants' Summary Judgement Motion — would only delay resolution of the lawsuit and prejudice Defendants by requiring an entirely new round of discovery.

42

Accordingly, to the extent Plaintiff's Second Motion seeks to add new claims, the Court denies such request.

### III. The Sealing-Related Motions

In connection with their request for summary judgment, Defendants seek to seal Officer Ferguson's body camera video footage. (See Docket Entry 44.) Conversely, Plaintiff seeks to unseal that footage. (See Docket Entry 51.) As support for their sealing request, Defendants state (in full):

> 1. Exhibit A to the Affidavit of B.A.M. Ferguson is a CD-ROM containing a true and accurate copy of footage from defendant Ferguson's body camera, recorded on January 20, [sic] 2020, which is being manually filed. Defendants' counsel interprets N.C. Gen. Stat. § 132-1.4A(g) as mandating that recordings in the custody of law enforcement agency, such as defendant Ferguson's body camera recordings, "shall only be released" to the public "pursuant to a court order." Defendants' counsel is not aware of any court order allowing the release of the body camera footage being filed with this Court.
>
> 2. Also, the body camera footage in question shows [] Plaintiff's pants falling down as he is running away from police. Thus, the body camera footage includes footage showing partial nudity of [] Plaintiff for a period of time. In light of this, Defendants' counsel felt that the CD-ROM containing this footage should be sealed in order to protect [] Plaintiff's privacy.

(Docket Entry 44 at 1-2; see also Docket Entry 53 at 1 ("Defendants believe that Exhibit A to Ferguson's Affidavit should be sealed, and should remain sealed, for the reasons stated in Doc[ket Entry] 44 . . .[, which] is incorporated by reference.").)

For his part, Plaintiff "giv[es] the Court consent for the privacy and confidentiality of Exhibit A to the Affidavit of B.A.M.

43

Ferguson [to] be unsealed pursuant to Court order from the Judges of this Court to be revealed in the presence of honor and to the public." (Docket Entry 51 at 2 (all-cap font omitted); see also Docket Entry 57 at 2-3 (noting filing of Plaintiff's Unsealing Motion and "regiving [sic] [his] full consent to release that video to the public" (all-cap font omitted)).)

"[T]he courts of this country recognize a general right to inspect and copy . . . judicial records and documents." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978). "The right of public access to documents or materials filed in a district court derives from two independent sources: the common law and the First Amendment." Virginia Dep't of State Police v. Washington Post, 386 F.3d 567, 575 (4th Cir. 2004). "[T]he common law presumption in favor of access attaches to all 'judicial records and documents,'" Stone v. University of Md. Med. Sys. Corp., 855 F.2d 178, 180 (4th Cir. 1988) (quoting Nixon, 435 U.S. at 597), but "the First Amendment guarantee of access has been extended only to particular judicial records and documents," id. (citing, inter alia, Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir. 1988) (involving summary judgment materials)).

"When presented with a request to seal judicial records," the Court begins by "determin[ing] the source of the right of access with respect to each document," as "only then can it accurately weigh the competing interests at stake." Virginia Dep't of State

_Police_, 386 F.3d at 576 (internal quotation marks and brackets omitted).). "Th[e common-law] presumption of access . . . can be rebutted if countervailing interests heavily outweigh the public interests in access." _Rushford_, 846 F.2d at 253. The relevant factors include "whether the records are sought for improper purposes, such as promoting public scandals or unfairly gaining a business advantage; whether release would enhance the public's understanding of an important historical event; and whether the public has already had access to the information contained in the records." _In re Knight Publ'g Co._, 743 F.2d 231, 235 (4th Cir. 1984). Under the more stringent first-amendment standard, the Court may seal material "only on the basis of a compelling governmental interest, and only if the denial [of access] is narrowly tailored to serve that interest." _Stone_, 855 F.2d at 180.

Under either standard, the Court must then evaluate the competing interests via the following approach. First, "it must give the public notice of the request to seal and a reasonable opportunity to challenge the request." _Virginia Dep't of State Police_, 386 F.3d at 576.[18] Next, "it must consider less drastic alternatives to sealing." _Id._ Finally, "if it decides to seal[,]

---

18 The Sealing-Related Motions have appeared on the public docket since January 2022. (_See_ Docket Entries 44, 51.) All interested persons thus have received "notice of the request to seal and a reasonable opportunity to challenge the request," _Virginia Dep't of State Police_, 386 F.3d at 576, yet the Docket reflects no objections to the Sealing-Related Motions from any non-parties (_see_ Docket Entries dated Jan. 7, 2022, to present).

it must state the reasons (and specific supporting findings) for its decision and the reasons for rejecting alternatives to sealing." Id. "Adherence to this procedure serves to ensure that the decision to seal materials will not be made lightly and that it will be subject to meaningful appellate review." Id. This approach also reflects the reality that "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern," Landmark Commc'ns, Inc. v. Virginia, 435 U.S. 829, 839 (1978), as well as that "the public's business is best done in public," Cochran v. Volvo Grp. N. Am., LLC, 931 F. Supp. 2d 725, 727 (M.D.N.C. 2013).

Here, Defendants seek to seal an exhibit in support of a dispositive motion. (See Docket Entry 44 at 1-2.) Accordingly, the more-rigorous first-amendment standard applies to their request. See Rushford, 846 F.2d at 253 ("We believe that the more rigorous First Amendment standard should also apply to documents filed in connection with a summary judgment motion in a civil case."). Therefore, the Court may grant Defendants' request "only on the basis of a compelling governmental interest and only if the denial [of access] is narrowly tailored to serve that interest." Robinson v. Bowser, No. 1:12cv301, 2013 WL 3791770, at *3 (M.D.N.C. July 19, 2013) (internal quotation marks omitted) (brackets in original).

Defendants offer two justification for sealing the body camera footage:  a state law, which they maintain authorizes release of the footage only "'pursuant to a court order,'" and Plaintiff's privacy interest due to his "partial nudity" in the footage. (Docket Entry 44 at 1-2.)  Notably, Defendants do not assert that either justification rises to the level of a "compelling government interest" under the relevant first-amendment standard (see id.), and this Court recently rejected a similar attempt to shield video footage based on the specified state law, see Pegram v. Williamson, No. 1:18cv828, 2022 WL 541495, at *27-28 (M.D.N.C. Feb. 23, 2022). Moreover, Plaintiff has consented to release of the video footage, obviating any privacy concerns.  Under the circumstances, the Court will deny Defendants' request to seal Officer Ferguson's body camera footage and will grant Plaintiff's request for its unsealing.

## IV. Defendants' Summary Judgment Motion

Finally, Defendants seek summary judgment on Plaintiff's individual-capacity excessive force claims against them.  (See Docket Entry 42.)  In particular, Defendants assert that "Plaintiff has not shown, and cannot show, that these officers violated Plaintiff's constitutional rights."  (Docket Entry 43 at 15.) Defendants' contention possesses merit.

47

## A. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, No. 4:08-cv-2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Baber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). Further, factual allegations in a complaint or other court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

Ordinarily, "where affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie." Raynor v. Pugh, 817 F.3d 123, 130 (4th Cir. 2016) (internal quotation marks omitted). Yet, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could

believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007); see also, e.g., Love v. Beasley, 788 F. App'x 935, 937 (4th Cir. 2020) (concluding, on review of summary judgment decision, "that the district court did not err in finding that [a defendant] did not punch [the plaintiff] as alleged, because video of the incident confirms [the defendant's] denial"). In Scott,

> the [United States] Supreme Court was faced with a videotape of the incident in question that "utterly discredited" the plaintiff's account, rendering it a "visible fiction." 550 U.S. at 380–81. As between a videotape of undisputed authenticity, *id.* at 378, and the plaintiff's story, the Court held, the videotape should prevail. Where the nonmoving plaintiff's account is "blatantly contradicted by the record" so that "no reasonable jury could believe it," it should not be adopted by a court ruling on a motion for summary judgment. *Id.* at 380.
>
> As [the Fourth Circuit] ha[s] clarified, *Scott* is the exception, not the rule. It does not "abrogate the proper summary judgment analysis, which in qualified immunity cases 'usually means adopting . . . the plaintiff's version of the facts.'" *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott*, 550 U.S. at 378). That standard continues to apply in the face of "documentary evidence" that lends support to a government official's account of events, *id.*, or even makes it "unlikely" that the plaintiff's account is true, *United States v. Hughes*, 606 F.3d 311, 319–20 (6th Cir. 2010) (holding that *Scott* does not apply to photographs rendering plaintiff's account "unlikely"). Summary judgment is proper under *Scott* only when there is evidence — like the videotape in *Scott* itself — of undisputed authenticity that shows some material element of the plaintiff's account to be "blatantly and demonstrably false." *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007) (refusing to extend *Scott* to evidence in form of police photographs

50

> that fail to depict "all of the defendant's conduct and all of the necessary context"); *see also Witt*, 633 F.3d at 277 (holding *Scott* inapplicable to soundless video that does not capture key disputed facts).

Harris v. Pittman, 927 F.3d 266, 275–76 (4th Cir. 2019) (ellipsis in original) (parallel citations omitted).

### B. Excessive Force Standards

"Where, as here, [an] excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." Graham v. Connor, 490 U.S. 386, 394 (1989) (ellipses in original). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (certain internal quotation marks omitted). Notably, though, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id.

Although an objective test, see id. at 397, the Fourth Amendment's reasonableness test "is not capable of precise definition or mechanical application." Id. at 396 (internal quotation marks omitted). Instead,

51

its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Id. The Court conducts this inquiry "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," id., recognizing "that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation," id. at 397. Ultimately, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id.

## C. Analysis

Plaintiff has averred that unnamed officers with the Winston-Salem Police Department "treated [him] like a wild animal," as his "body was exposed in public and [his] hair was ripped from [his] scalp and they stuck their fingers in [his] anal area." (Docket Entry 19 at 1 (emphasis in original).) Further, according to Plaintiff, he "was struck with a vehicle and brutal[l]y beat[e]n." (Id. at 1-2.) As relevant to these contentions, the Complaint asserts that, on January 2, 2020, Plaintiff stopped his scooter at "the side of the road to fix [his] mirror." (Docket Entry 2 at 8.) An unmarked patrol car pulled up behind Plaintiff and, "not knowing

52

who the individual was who was in the car, [Plaintiff] ran for [his] life." (Id.) The car knocked Plaintiff off his scooter, so he "ran on foot and was chased by [Officer Ferguson,] who tackled [Plaintiff] and beg[a]n to pull [Plaintiff's] hair out as [Officer Ferguson] stuck his fingernails behind [Plaintiff's] ears as [Plaintiff] got handcuffed." (Id.) While Officer Ferguson held Plaintiff "in a 'chokehold' until [Plaintiff] fainted" (id.), Officers Boissey and LaValley began striking Plaintiff before Officer LaValley pulled down his pants and Officers Boissey and LaValley stuck their fingers into Plaintiff's anal area (see id. at 8-9).

As relevant to Plaintiff's claims, however, Officer Ferguson's body camera footage establishes that (i), to the extent the patrol car touched Plaintiff, Officer Wagoner, not Officer Ferguson, Officer Boissey, or Officer LaValley, opened the car door into Plaintiff; (ii) the patrol car did not knock Plaintiff off his scooter; (iii) officers did not undress Plaintiff; instead, his pants and underwear fell down of their own accord; (iv) Officer Ferguson did not use a chokehold against Plaintiff (who further did not faint during the incident); (v) Sgt. Phillips and Officer Wagoner, not Officer LaValley and Officer Boissey, participated in Plaintiff's arrest; (vi) Officer Boissey and Officer LaValley did not touch Plaintiff in Officer Ferguson's presence; and (vii), by the time other officers appeared on the scene, Sgt. Phillips,

53

Officer Wagoner, and Officer Ferguson had restored Plaintiff's pants and underclothing, such that he remained fully clothed the entire time he spent in the company of other officers.

As relevant here, "Section 1983 authorizes a plaintiff to sue for an alleged deprivation of a federal constitutional right by an official acting 'under color of' state law." Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018). "To establish personal liability under § 1983, however, the plaintiff must affirmatively show that the official charged acted personally in the deprivation of the plaintiff's rights. That is, the official's own individual actions must have violated the Constitution." Id. (brackets, citation, and internal quotation marks omitted); see also id. (explaining that "mere knowledge of such a deprivation does not suffice"). Because the evidence establishes that Officer Boissey and Officer LaValley did not participate in the challenged conduct, the Court should grant Officer Boissey and Officer LaValley summary judgment on Plaintiff's excessive force claims. See Brown v. Gilmore, 278 F.3d 362, 369 (4th Cir. 2002) (recognizing that, where a defendant did not "ever touch[ the plaintiff], there can be no excessive force claim made against him").

Conversely, the evidence establishes Officer Ferguson's participation in three aspects of the challenged conduct: (i) the car block; (ii) the hair pulling; and (iii) the pressure point

54

maneuver. As relevant to the analysis of Officer Ferguson's actions, the evidence reflects that, after receiving information from a confidential informant that someone meeting Plaintiff's description (and operating a scooter) had pointed a firearm at a dog and possibly possessed narcotics at an apartment complex known for drug and firearm activity (see Docket Entry 43-2, ¶ 3; see also Docket Entry 43-4, ¶ 2 (describing area as "'open air drug market'")), Officer Ferguson observed Plaintiff commit multiple traffic infractions as he departed the apartment complex (on a scooter) (see Docket Entry 43-2, ¶ 4). Plaintiff "pulled [his scooter] over to the side of the road and sat briefly" (id., ¶ 5) with his right foot on the sidewalk. (See also Docket Entry 2 at 8 (alleging that Plaintiff stopped scooter at side of road to fix mirror).) With his emergency lights activated, Officer Ferguson pulled his unmarked patrol car behind Plaintiff, prompting Plaintiff to put his left leg down into the street and angle the scooter back towards the road away from the sidewalk. As Plaintiff readied himself to flee, Officer Ferguson steered the patrol car to the left of the scooter while Officer Wagoner yelled "Don't run" through his partially opened car door. The patrol car and scooter traveled parallel to each other momentarily before Officer Ferguson angled the patrol car in front of the scooter, blocking its path. Meanwhile, Plaintiff jumped over the front tire of the scooter and started running back in the direction of the apartment complex as

Officer Ferguson put the car in park and exited the vehicle. Three seconds elapsed between Plaintiff placing his left foot on the ground and jumping over the scooter; five seconds total elapsed between Plaintiff putting his left foot on the ground and Officer Ferguson exiting the vehicle.

Officer Ferguson chased Plaintiff, on foot, back towards the apartment complex, with Officer Ferguson yelling at Plaintiff to show his hands and stop reaching. Plaintiff tripped, apparently over his pants, which had fallen down around his ankles as he ran, causing Plaintiff to roll over a few times. Plaintiff came up to his knees facing Officer Ferguson and reaching towards his left front jacket pocket. Officer Ferguson ran into Plaintiff, causing them both to fall on the ground, with Officer Ferguson gripping Plaintiff's hair. Within three seconds of tackling Plaintiff, Officer Ferguson had released Plaintiff's hair and grabbed Plaintiff's arm while yelling to Plaintiff to show his hands. Officers handcuffed Plaintiff, whom Officer Ferguson repeatedly instructed to "Stop moving." When Plaintiff continued rocking back and forth, Officer Ferguson exclaimed, "Didn't I say to stop fucking moving?" and reached up behind Plaintiff's ear. Officer Ferguson used his thumb to press behind Plaintiff's ear for nine seconds, saying again, "Stop moving."

Turning to the first Graham factor, "the severity of the crime at issue," Graham, 490 U.S. at 396, the record reflects that

56

Officer Ferguson observed Plaintiff commit two traffic infractions. Because this "offense was a minor one,. . . the first *Graham* factor weigh[s] in [P]laintiff's favor." Jones v. Buchanan, 325 F.3d 520, 528 (4th Cir. 2003) (internal quotation marks omitted).

However, Officer Ferguson possessed reliable information indicating that Plaintiff carried a firearm, with which he had threatened a dog, and possibly possessed narcotics in an open-air drug market, a combination that "pose[d] a danger to [officers'] safety, as there is a strong connection between the sale of drugs and the use of guns to protect those engaged in such criminal conduct," Givens v. Demaioribus, No. 3:09-cv-158, 2012 WL 706122, at *7 (W.D.N.C. Mar. 5, 2012). Moreover, immediately before Officer Ferguson tackled him, Plaintiff — against Officer Ferguson's orders — reached for his pocket, increasing the potential danger to Officer Ferguson. Similarly, prior to officers searching Plaintiff (and/or discovering the firearm that he clandestinely discarded during his flight), Plaintiff continued to move around on the ground, against Officer Ferguson's orders, until Officer Ferguson applied a pressure point technique behind Plaintiff's ear. Accordingly, the second factor, "whether the suspect poses an immediate threat to the safety of the officers or others," Graham, 490 U.S. at 396, weighs against Plaintiff.

As for the third Graham factor, "whether [the suspect wa]s actively resisting arrest or attempting to evade arrest by flight,"

id., the record establishes that Plaintiff attempted to flee on his scooter prior to Officer Ferguson blocking the scooter with the patrol car. The record further establishes (i) that Plaintiff continued to flee prior to physical contact with Officer Ferguson, which resulted in the loss of two of Plaintiff's dreadlocks, as well as (ii) that Plaintiff continued moving around — a situation that Officer Ferguson described as "pull[ing] away from officers while lying on the ground" (Docket Entry 43-2, ¶ 10) — against Officer Ferguson's orders, prior to application of the pressure point technique. Thus, the third <u>Graham</u> factor also strongly undermines Plaintiff's position.

Put simply, the totality of the circumstances reveal that, in his split-second decision-making, Officer Ferguson acted with objective reasonableness when he blocked Plaintiff's flight path, tackled Plaintiff, resulting in the loss of two dreadlocks, and applied a pressure point technique to stop Plaintiff's ongoing resistance. Accordingly, the Court should also grant summary judgment to Officer Ferguson on Plaintiff's excessive force claim. <u>See, e.g.</u>, <u>James v. York Cnty. Police Dep't</u>, 160 F. App'x 126, 129, 134 (3d Cir. 2005) (concluding that officer, "in slowly moving the van to block [the plaintiff's] escape, did not use unreasonable force," despite hitting plaintiff with van as he moved away from other officers); <u>Joos v. Ratliff</u>, 97 F.3d 1125, 1126 (8th Cir. 1996) (concluding that officer did not use excessive force where he

58

employed mandibular nerve pressure point to compel pretrial detainee to comply with fingerprinting); Pride v. Does, 997 F.2d 712, 714, 717 (10th Cir. 1993) (rejecting excessive force claim where officer applied pressure to pressure point on handcuffed, disorderly individual's neck for up to 30 seconds); Edwards v. Renalds, No. 7:19cv765, 2022 WL 866423, at *6-7 (W.D. Va. Mar. 23, 2022) ("As the video clearly depicts, when [the plaintiff] started the sedan and moved to the driver's seat, [the defendant's] response was to park his truck as a partial roadblock to discourage escape. . . . Under the *Graham* factors, the court is satisfied that [the defendant's] use of force (moving his truck into [the plaintiff's] path before [the plaintiff] drove past him, or even backing a few feet into [the plaintiff's] fleeing car) can only be characterized as a reasonable response to the perceived risks that did not violate [the plaintiff's] constitutional rights."), appeal filed, No. 22-6494 (4th Cir. Apr. 26, 2022); Rogers v. Cotton, Nos. 4:08-cv-3891, 4:09-cv-1290, 2012 WL 396194, at *8 (D.S.C. Jan. 18, 2012) (finding that officer acted with objective reasonableness where "he used his vehicle to block [the p]laintiff's flight on foot and when he tackled [the p]laintiff"), report and recommendation adopted, 2012 WL 396062 (D.S.C. Feb. 7, 2012); Hare v. Woodhead, Civ. Action No. 08-5894, 2011 WL 1748469, at *8 (D.N.J. May 6, 2011) (concluding that officer did not use excessive force where he tackled individual after car and foot chase).

59

<u>**CONCLUSION**</u>

Plaintiff failed to establish the existence of any insanity defense or the propriety of amending his pleadings, but the Court will provide Plaintiff with copies of the requested procedural rules. In addition, Defendants failed to justify the sealing of Officer Ferguson's body camera footage. Finally, the record establishes as a matter of law that Officer Ferguson, Officer LaValley, and Officer Boissey did not utilize excessive force against Plaintiff during the incident in question.

**IT IS THEREFORE RECOMMENDED** that Defendants' Summary Judgment Motion (Docket Entry 42) be granted.

**IT IS FURTHER ORDERED** that (i) Plaintiff's First Motion (Docket Entry 40) is **DENIED**; (ii) Plaintiff's Second Motion (Docket Entry 58) is **GRANTED IN PART** and **DENIED IN PART** as follows: the Clerk shall send Plaintiff a copy of the Civil Rules portion of the Local Rules, as well as Federal Rules of Civil Procedure 5, 5.2, 6, 7, 10, 11, 15, 16, 26, 28, 29, 30, 31, 33, 34, 36, 45, 56, and 72; and (iii) Defendant's Sealing Motion (Docket Entry 44) is **DENIED** and Plaintiff's Unsealing Motion (Docket Entry 51) is **GRANTED** insofar as the Court will not seal Officer Ferguson's body camera footage.

This 22nd day of August, 2022.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
